## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL D. WARREN

            Plaintiff,

v.

ZAPATA COMPUTING, INC.

    and

CHRISTOPHER SAVOIE

    and

MIMI FLANAGAN

         Defendants.

CIVIL ACTION NO.

_____

## **VERIFIED COMPLAINT**

Plaintiff Michael D. Warren ("Warren") brings this action against his former employer, Zapata Computing, Inc. ("Zapata"), its Chief Executive Officer, Christopher Savoie, and its Chief Financial Officer, Mimi Flanagan for a sum in excess of $75,000, upon the causes of action set forth below.

## **Jurisdiction and Venue**

1.     Plaintiff Michael Warren is an individual with a residential address at 115 Evergrene Parkway, Palm Beach Gardens, FL.

2.     Defendant Zapata Computing, Inc. is a business entity organized and existing under the laws of the State of Delaware, with its principal place of business located at 100 Federal Street, 20th Floor, Boston, MA.

1

3.     Defendant Christopher Savoie is Chairman and CEO of Defendant Zapata, and maintains his principal place of business at 100 Federal Street, 20th Floor, Boston, MA.

4.     Defendant Mimi Flanigan is Treasurer and CFO of Defendant Zapata, and maintains her principal place of business at 100 Federal Street, 20th Floor, Boston, MA.

5.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

6.     Venue is proper in this district under 28 U.S.C. § 1391(b) because all Defendants are located in Massachusetts and because a substantial part of the events of omissions giving rise to Warren's claims occurred in Massachusetts.

**Facts**

7.     Plaintiff Warren was employed by Zapata as Zapata's Vice President of Global Sales and Business Development, from approximately April 2018 until September 30, 2022.

8.     At material times, Zapata was in the business of providing quantum computing services on a consultancy and project management basis for corporate clients with specific & discrete quantum use cases that are unique to each client's business.  At all material times, Zapata has neither produced nor marketed quantum computing software for sale to its clients, nor has it ever released quantum workflow software to its clients. Rather, Zapata's software is used exclusively by Zapata staff internally when working on each customer's specific quantum use case.  In short, Zapata's business model is exclusively the provision of services on a consultancy-oriented, single project- or task-management basis.

9.     At no point in time was Warren given access to the intellectual property that underlies Zapata's quantum computing services.

10.     Prior to his approximately 5-year employment with Zapata, Warren worked for 20 years in the high-tech industry selling traditional hardware, software and consulting services.

11.    In 2018, in connection with the start of his employment with Zapata, Warren executed Zapata's Non-Disclosure, Non-Competition and Assignment of Intellectual Property Agreement (hereafter "the Non-Compete Agreement" or "the NCA"). A copy of the NCA is attached hereto as **Exhibit A.**

12.    During the course of his employment as Vice President of Global Sales and Business Development, Warren received compensation in the form of a salary, commissions, and stock options.

13.    At a minimum, at least until  early March 2022, Warren's salary and commission payments were determined by the 2021 Compensation Plan ("Compensation Plan")..  A copy of the Compensation Plan is attached hereto as **Exhibit B**.

14.    Pursuant to the Compensation Plan, Warren received a $150,000 annual base salary and variable pay in the form of commissions and bonuses.  Warren would receive an annual bonus if certain Zapata and individual goals were met and would also receive commission payments for each sale.

15.    The Compensation plan provides that, "Although you will receive a commission on any sales achieved, your target for 2021 is $2 million in total contract value for the sales of our products and services. Total contract value is defined as the full value of a contract that you sign with a client. TCV value in a given year is sum of TCV for contracts signed within that year."

16.    It further provides that "Commissions on Existing accounts will be calculated at 3% of TCV. Commissions on all New accounts that total up to $2 million will be calculated at 6% of TCV. Commission on all New accounts once the $2 million quota is achieved will be calculated at 8% of TCV."

17.    Finally, the plan states, "**<u>Your commissions will be paid quarterly for any sales</u>** **<u>closed during the quarter. This is not subject to payment from clients</u>**, with the assumption that clients pay their bills on time. You may be enlisted to contact and apply pressure to clients who are considerably behind on their payments. In the event an client company exercises a cancellation of a contract or, in the rare situation that we can not collect from a customer, we will write off account and claw back your respective achievements from that deal." Exhibit B, p. (sic) (emphasis added)

18.    The Compensation Plan does not require that an employee remain employed by Zapata in order to be eligible for commission payments.  Rather, it requires only that Warren close a sale and he would then receive his corresponding commissions on a quarterly basis.  Nor does it afford Zapata any discretion to unilaterally change its terms.

19.    Indeed, Warren's Commission Tracking Sheet mirrors the language of the Compensation Plan in that it lacks any requirement that Warren be a Zapata employee to be eligible for commission payments, and states that it was last updated on September 26, 2022— four days prior to the effective date of Warren's termination.  The Commission Tracking Sheet indicates it had been updated by "MF" which, on information and belief, indicates Defendant Mimi Flanagan.

20.    Warren closed four major deals between January and March 1, 2022:

a.    **British Petroleum COE** – TCV: $2,800,000 (3% commission rate)

b.    **Andretti Auto** – TCV: $5,000,000 (6% commission rate)

c.    **DARPA TAII** – TCV: $2,950,000 (6% commission rate)

d.    **DARPA TAI** – TCV: $3,485,653 (6% commission rate)

21.     Warren had already eclipsed his financial targets for 2022 by March 1, 2022, generating $14,235,653 TCV in bookings in excess of his $10,000,000 2022 TCV revenue goal.

22.     Warren booked all four of the above deals under the terms of Compensation Plan; no other plan was in place at the time.

23.     In Spring 2022, after he had closed the above-listed four very large deals, Zapata wanted to alter the terms of Warren's existing commission structure as, on information and belief, Zapata was rapidly running out of funding. A new commission plan was presented to Warren and signed by him on or after March 7, 2022. The new plan changed several times over the subsequent months.

24.     In May 2022, Zapata hired Gregg Carman ("Carman") as its new Chief Revenue Officer, as, on information and belief, Zapata needed to make significant changes in order to avoid running out of operating capital. At this point in time, Zapata owed Warren nearly $700,000 in commission payments. In June 2022, Carman requested that Warren prepare a schedule of events to which Warren would bring Warren's clients. Carman and Warren differed greatly on what types of events they felt that Warren's client contacts would be interested in and engaged in a back-and-forth discussion over the course of several weeks.

25.     The first negative note in Warren's personnel file is dated June 24, 2022—four years after he joined the company and just one month after Carman joined—and faults him for not delivering on the events schedule he had been discussing with Carman and raises the absurdly disproportionate measure of placing Warren on a Performance Improvement Plan ("PIP")—a classic prelude to termination—the following Thursday. The PIP was purportedly because Warren had yet to prepare the final list of events to bring his own clients to. The delay was due solely to his disagreement with Carman on the types of events that the Company should

sponsor.  He was to be put on a PIP despite Warren's outstanding revenue generation as VP of Global Sales.

26.     Warren's personnel file states that on July 12, 2022, Carman entered Ramsay's office and said, "we need to take care of MW situation." The document containing this documentation in his personnel file was inexplicably redacted immediately after that line. The document goes on to say that this "situation" with "MW" needed to be handled with the "utmost confidentiality."

27.     Notes to the file following the July 12, 2022 meeting between Carman and Warren indicate that Carman asked Warren to retire.  Warren stated that he was not ready to do so.  After he stated that he planned to keep working, the file states that Warren was subjected to his first corrective action in his career at Zapata a few days later. And this first corrective action was a PIP. Warren, however, was never informed, either verbally or in writing, that he had supposedly been placed on a PIP. Indeed, beyond the continued back-and-forth with Carman about the entertainment events schedule, Warren was never informed either verbally or in writing that there were *any* issues with his performance.

28.     On or around September 13, 2022, Warren met with Carman and Ramsay via Zoom. On the call, Warren was informed that he would be presented with a separation package and told that he should take it and retire. Warren was subsequently told that he would be required to send a message to the Zapata-wide Slack channel indicating that he was choosing to resign on his own volition—not being forced out—and that the message needed to be approved by Ramsay in advance otherwise it would affect the terms of his separation package. Warren and Zapata proceeded to go back and forth on the terms of a separation agreement over the subsequent weeks.

29.     On October 5, 2022, at 4:53 p.m., Attorney Nicole Fitchpatric, the Company's General Counsel, e-mailed Warren an agreement terminating him from his role as VP of Global Sales ("Separation Agreement").  The Separation Agreement also contained a new agreement, hiring Warren as a consultant for Zapata at the rate of $2,000 a month ("Consulting Agreement"). Warren responded to Attorney Fitchpatric at 8:21am the following morning, October 6, 2022, with proposed changes to the Separation Agreement from his attorney.

30.     Attorney Fitchpatric responded at 4:50 pm that same day, stating that Zapata would not agree to change any of the language in the agreements. Attorney Fitchpatric told Warren he had to send signed agreements by 9:00 am the following morning, or the offers would be rescinded.

31.     The Separation Agreement states that it is contingent on Warren's execution of a Consulting Agreement between Warren and Zapata.  Warren executed both the Consulting Agreement and Separation Agreement on October 6, 2022.

32.     The Consulting Agreement provides that Zapata shall pay Warren a consulting fee of $2,000 per month for a twelve-month term, unless terminated earlier or extended by mutual agreement.  It further requires that Warren agree that "During the Consultation Period (as defined below) and for a period of six (6) months thereafter, [Warren] shall not engage in any activity that has a conflict of interest with the Company, including without limitation any competitive employment, business or other activities, and he shall not assist any other person or organization that competes, or intends to compete, with the Company."  Exhibit C, ¶ 2.

33.     The Company required Warren to enter into this Consulting Agreement with an even broader non-compete restriction.

34.    The Consulting Agreement does not advise Warren that he may consult with an attorney prior to signing.

35.    The Consulting Agreement does not provide any consideration for the duration of the restricted period.

36.    The Consulting Agreement did not provide Warren with seven days to rescind.

37.    The Consulting Agreement does not state that the non-compete provision would not be effective if Warren was terminated without cause.

38.    The Consulting Agreement does not restrict the geographical reach of the non-compete provision.

39.    The Consulting Agreement does not pay Warren enough to qualify him as exempt under the Fair Labor Standards Act.

40.    The Consulting Agreement's non-compete provision is not limited to the specific services provided by Warren within the last two years of employment.

41.    The Consulting Agreement, drafted solely by Zapata and made effective after the Separation Agreement, states "This Agreement constitute the entire agreement between the parties and supersedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement." Id. at ¶ 13.

42.    Accordingly, by its own terms, the non-competition restriction of the Consulting Agreement superseded all prior non-competition agreements between Warren and Zapata.

43.    The Separation Agreement reflects Zapata's understanding that Warren would continue to be paid commissions after his employment terminated.  Specifically, it provides that,

> You acknowledge and understand that, except for a lump sum payment of $42,292, equal to three (3) months of base salary and three (3) months of COBRA premiums, **the commissions already earned** and the specific financial consideration and other benefits contained in this Agreement, you are not entitled

to and shall not receive any additional compensation, consideration or benefits from the Company.

Exhibit D (emphasis added)

44.    The Separation Agreement also provides as consideration continued vesting of the options granted to Warren pursuant to Zapata's 2018 Stock Incentive Plan, contingent upon "approval by the Board of Directors and upon the herein referenced Consulting Agreement being in good standing". *See* **Exhibit D**, ¶ 5.  Pursuant to the terms of the Separation Agreement and Consulting Agreement, the Stock Incentive Plan was amended by Zapata and Warren to change his stock options from "Incentive" to "Nonstatutory." A copy of the amended Stock Incentive Plan is attached hereto as **Exhibit D**.

45.    On February 2, 2023, minutes after updating his LinkedIn to reflect that he had joined Q-Ctrl, a software company that sells quantum computing *products*—not *services*, like Zapata—Warren received an email and attached letter from Attorney Fitchpatric informing him that Zapata was terminating the Consulting Agreement based on Warren "obtaining competitive employment" with Q-Ctrl.

46.    There is no market overlap between what Q-Ctrl sells and the services that Zapata provides; customers do not need to choose between them.

47.    Q-Ctrl and Zapata do not compete with one another.

48.    Following the termination of his employment with Zapata in September 2022, as required under the Compensation Plan, Warren continued to receive commission payments on the sales he had closed on the 15th day of each month, through January 2023.  Those payments ceased in February 2023.

49.    Under the terms of the Compensation Plan, Warren earned, and is due, full commission payments for the British Petroleum COE, Andretti Auto, DARPA TAI, and DARPA TAII deals that he closed, with approximately $534,622 yet to be paid.

50.    No contingency on his commission payment remains outstanding under the Compensation Plan.

51.    Zapata also stopped paying Warren the $2,000 monthly consulting fees in February 2023.

52.    Shortly after February 2, 2023, Warren discovered that Zapata had also adjusted the status of his vested but not yet exercised stock options to forfeited.

## COUNT I: UNPAID WAGES & BENEFITS UNDER THE MASSACHUSETTS WAGE ACT, M.G.L. c. 149, §§ 148 & 150

(Against all defendants)

53.    Warren repeats and realleges the allegations above as if fully set forth here.

54.    M.G.L. c. 149, § 148 provides:

Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week […] but any employee leaving his employment shall be paid in full on the following regular pay day […].

55.    As set forth above, Warren's commission payments had been definitely determined, and had become due and payable, and are therefore considered wages.

56.    Defendants failed to timely pay Warren the full amount of his earned wages when the same became due and payable.

57.    At all relevant times, Savoie as Chairman and Chief Executive Officer of Zapata and Flanagan as Treasurer and Chief Financial Officer exercised managerial control over Zapata,

and are, therefore, personally liable for damages for nonpayment of wages pursuant to G.L.c. 149, § 148.

58.    Defendants' failure to comply with M.G.L. c. 149 § 148 entitles Warren to recover treble damages, interest, reasonable attorney's fees, and costs pursuant to M.G.L. c. 149, § 150.

## COUNT II: BREACH OF CONTRACT

(Against Zapata only)

59.    Warren repeats and realleges the allegations above as if fully set forth here.

60.    Warren and Zapata were parties to a contract, the Separation Agreement, under which Zapata agreed to and had a duty to permit Warren's stock options granted under the 2018 Stock Incentive Plan, and the subsequently executed Option Amendment, to continue vesting.

61.    Warren and Zapata were also parties to the Consulting Agreement.

62.    Warren and Zapata were also parties to the Compensation Plan.

63.    Zapata breached its contractual duties under the Separation Agreement by designating Warren's stock options as forfeited when it unlawfully terminated the Consulting Agreement and, by extension, the Separation Agreement.

64.    Zapata breached its contractual duties under the Consulting Agreement by failing to pay Warren his consulting fees between February 2023 and the remainder of the consultation period as defined therein.

65.    Zapata breached its contractual duties under both the Compensation Plan and the Separation Agreement by failing to pay Warren his commissions.

66.    Zapata's breaches were material.

67.    As a result of Zapata's breaches, Warren has suffered damages through the loss of his stock options, commissions, and consulting fees.

68.    Zapata's breaches were both the proximate and actual cause of Warren's damages.

69.    Zapata's breaches of contracts entitle Warren to recover contract damages, including but not limited to, incidental and consequential damages, and pre-judgment interest from the date of the breaches.

## COUNT III: UNJUST ENRICHMENT

(Against all defendants)

70.    Warren repeats and realleges the above allegations as if fully set forth here.

71.    Zapata received the benefit of Warren's time, work, professional skill, and payments from his clients without fully compensating him for the same and as Warren legitimately expected when he performed said work.

72.    Zapata was unjustly and unfairly enriched by the amount of the outstanding commission payments it has withheld from Warren.

73.    Warren has suffered damages as a result of Zapata withholding the commission payments he is owed and that are outstanding under the Compensation Plan.

## COUNT IV: QUANTUM MERUIT

(Against all defendants)

74.    Warren repeats and realleges the above allegations as if fully set forth here.

75.    Zapata received the benefit of Warren's time, work, professional skill, and payments from his clients without fully compensating him for the same and as Warren legitimately expected when he performed said work.

76.    Warren has suffered damages as a result of Zapata withholding the commission payments he earned.

12

## COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(Against all defendants)

77.     Warren repeats and realleges the allegations above as if fully set forth herein.

78.     Every contract contains within it an implied covenant of good faith and fair dealing.

79.     Zapata breached the implied covenant by failing to pay Warren commission payments he had earned by attempting to retroactively change the terms of the operative commission plan such that he would no longer be eligible for such payments.

80.     As a direct and proximate result of Zapata's breach, Warren suffered damages.

## COUNT VI: DECLARATORY JUDGMENT

81.     Warren repeats and realleges the allegations above as if fully set forth herein.

82.     Warren requests a judicial declaration that Zapata's failure to comply with the Massachusetts Noncompetition Agreement Act renders void the restrictive covenants set forth in the Consulting Agreement.

83.     Warren further requests a judicial declaration that Warren is thereafter not bound by any restrictive covenant with regard to Zapata.

WHEREFORE, plaintiff Michael D. Warren respectfully requests judgment in his favor and against defendant Zapata, Savoie, and Flanagan on each count against each of them.  Warren further requests the Court:

1.     Order Zapata to reinstate Warren's 51,043 vested but not yet exercised stock options and allow his unvested options to continue vesting until such time that all 144,000 options granted to Warren by Zapata have vested;

2.      Award Warren treble damages on all unpaid commissions that he earned for a total of $1,603,866;

3.      Award Warren treble damages on all unpaid consulting fees, for a total of $48,000;

4.      Award Warren reasonable attorneys' fees and costs;

5.      Grant such further relief as this Court deems just, equitable, and proper.

Respectfully submitted,
**MICHAEL D. WARREN**
By his attorneys,

Samantha C. Halem (BBO# 649624)
*shalem@hrwlawyers.com*
John D. Arnold (BBO# 699350)
*jarnold@hrwlawyers.com*
Hirsch Roberts Weinstein LLP
24 Federal Street, 12th Floor
Boston, MA  02110
Phone: (617) 348-4300
Fax: (617) 348-4343

Dated:    December 26, 2023

## **VERIFICATION**

The undersigned, Michael Warren, has personal knowledge of the facts set forth in the above Complaint, and herby certifies that all of said facts are true, except such facts as are alleged on information and belief, which facts he believes to be true.

Signed under the pains and penalties of perjury on this date:

_____

Michael Warren

## **CERTIFICATE OF SERVICE**

I, Samantha C. Halem, certify that a copy of the foregoing document was served by electronic mail to the below address.

Christopher Feudo
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02110
*cfeudo@foleyhoag.com*

_____
Samantha C. Halem