# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

———————————————————————
)
MICHAEL D. WARREN,                                      )
)
               Plaintiff,                               )
)          **Civil Action No.**
       v.                                               )          **23-13197-BEM**
)
ZAPATA COMPUTING, INC., et al.,                         )
)
               Defendants.                              )
———————————————————————)

## MEMORANDUM AND ORDER ON
## MOTIONS FOR SUMMARY JUDGMENT

**MURPHY, J.**

This is an action involving employee claims for unpaid wages. Plaintiff Michael Warren has brought this action against his former employer, Zapata Computing, Inc. ("Zapata"); Zapata's former Chief Executive Officer, Christopher Savoie; and its former Chief Financial Officer, Mimi Flanagan (together with Savoie, "the Individual Defendants"), asserting violations of the Massachusetts Wage Act (the "Wage Act"), Mass. Gen. Laws ch. 149, §§ 148 and 150; unjust enrichment; quantum meruit; breach of contract; and breach of the implied covenant of good faith and fair dealing. Zapata has counterclaimed, asserting claims for breach of contract. Both Warren and Zapata also seek declaratory relief.

Warren has now moved for summary judgment on his Wage Act claim and on Zapata's breach of contract counterclaims. Collectively, the Individual Defendants and Zapata have moved for summary judgment on all claims asserted against them. For the reasons set forth below, Warren's motion for summary judgment will be granted in part and denied in part; the Individual

Defendants' motion for summary judgment will be granted in part and denied in part; and Zapata's motion for summary judgment will be granted in part and denied in part.

I.    **Background**

A.    **Factual Background**

The following facts appear to be undisputed.

Christopher Savoie was the Chairman and CEO of Zapata for the entirety of Michael Warren's employment by Zapata. Dkt. 80 ¶ 2. Mimi Flanagan was Zapata's CFO between October 2021 and May 2024. Dkt. 77 ¶ 4.

Zapata hired Warren in April 2018 to lead its sales efforts. *Id.* ¶ 5. In connection with the start of his employment with Zapata, Warren executed Zapata's Non-Disclosure, Non-Competition and Assignment of Intellectual Property Agreement ("NDNCA"). *Id.* ¶ 6. The NDNCA contains non-competition and non-solicitation provisions in effect for a period of twelve months following the termination of Warren's association with Zapata. *Id.* ¶ 7.

Warren and Zapata began discussing a formal commission structure in late 2021. Dkt. 80 ¶ 8.

On February 10, 2022, Zapata closed a deal with Andretti. Dkt. 77 ¶ 34.

On February 15, 2022, Warren and Zapata executed a document titled "Zapata Computing, Inc. 2021 Compensation Plan for Michael Warren" (the "2021 Plan"). *Id.* ¶ 10.[1]

On February 28, 2022, Zapata entered into a contract with DARPA for a deal that will be referred to as "DARPA TAII." Dkt. 80 ¶ 19.

---

[1] For purposes of summary judgment, Warren does not dispute that the 2021 Plan is not the operative commission plan. *See* Dkt. 74 at 5 n.2.

On March 7, 2022, Warren signed a document titled "2022 Compensation Plan Employee: Michael Warren" (the "March 2022 Plan").  Dkt. 77 ¶ 16.  The March 2022 Plan states that it is "for the calendar year 2022 for Zapata Computing, Inc. – which starts January 1st, 2022 and ends December 31st, 2022."  *Id.* ¶ 17.  The March 2022 Plan further states: "Commissions for the below identified contracts that were initiated in 2021 but are expected to close in 2022, will be calculated using 2021 commission plan rates.  These deals must close in the calendar year 2022 to be eligible for the grandfathered rates."  *Id.* ¶ 18.  Among the deals listed in the March 2022 Plan were DARPA TAI, DARPA TAII, and Andretti.  *Id.* ¶ 19.  The March 2022 Plan states: "Your commissions will be paid in the last payroll of the month following payment from the client.  The amount of commission distributed in any given payroll will be calculated based on the amount paid by the client."  *Id.* ¶ 20.  The March 2022 Plan provides that "Zapata Computing Inc. expressly reserves the right to change, modify, or delete the provisions herein, with written notice."  *Id.* ¶ 21.

On April 1, 2022, Zapata's Vice President of Corporate Operations, Greg Ramsay, sent Warren an email that stated, "Here is the updated commission plan for signature.  The update is in the last paragraph and states: You must be employed by Zapata Computing or an affiliate to be eligible for commission payments."  *Id.* ¶ 22.  Warren and Ramsay thereafter exchanged multiple emails and versions of the document.  *See generally id.* ¶¶ 23–30.  The updated commission plan ("April 2022 Plan") was never signed, and the parties sharply dispute whether it had been finalized. *See, e.g.*, Dkt. 80 ¶ 35.

In April 2022, Zapata closed a deal, DARPA TAI.  Dkt. 77 ¶ 40.

On September 27, 2022, Flanagan sent Warren a spreadsheet titled "payments due Michael Warren."  Dkt. 80 ¶ 54.  The document indicates that it was last updated by Flanagan on

September 26, 2022, and credits Warren with having booked four deals, including, as relevant here, Andretti, DARPA TAI, and DARPA TAII. *Id.* ¶ 55.[2]

Warren's employment with Zapata ended effective September 30, 2022. Dkt. 77 ¶ 58.

Warren and Zapata thereafter entered into a Separation Agreement, which Warren signed on October 6, 2022. *Id.* ¶ 59. The Separation Agreement states:

> You acknowledge and understand that, except for a lump sum payment of $42,292, equal to three (3) months of base salary and three (3) months of COBRA premiums, the commissions already earned and the specific financial consideration and other benefits contained in this Agreement, you are not entitled to and shall not receive any additional compensation, consideration or benefits from the Company. Commissions will continue to be paid in the last payroll of the month following payment from the customer.

*Id.* ¶ 60.

That same day, Warren executed a Consulting Agreement, which was Exhibit A to the Separation Agreement. *Id.* ¶ 65. The Consulting Agreement states: "During the Consultation Period . . . and for a period of six (6) months thereafter, the Consultant shall not engage in any activity that has a conflict of interest with the Company." *Id.* ¶ 66. The Consulting Agreement also states: "This Agreement shall commence on the date hereof and shall continue for twelve (12) months from the effective date of this agreement, unless sooner terminated in accordance with the provisions of Section 4 herein or extended by mutual agreement of the parties." *Id.* ¶ 67. The Consulting Agreement further provides:

> This Agreement may be terminated in the following manner: (a) by either party upon written notice to the other party. . . . In the event of termination, the Consultant shall be entitled to payment for services performed and . . . for expenses paid or incurred prior to the effective date of termination that have not been previously paid.

---

[2] Zapata asserts that the spreadsheet was not for calculation of Warren's commissions, but rather was for accounting purposes only. Dkt. 80 ¶ 54.

Dkt. 77 ¶ 68.  Warren provided consulting services under the Consulting Agreement, and Zapata paid Warren $2,000 per month under the Consulting Agreement from October 2022 to January 2023.  *Id.* ¶¶ 72–73.

On January 18, 2023, Savoie received an email from a third-party background check company requesting information about Warren in connection with his potential employment by Q-CTRL.  Dkt. 80 ¶ 69.  Zapata did not file for any kind of injunctive relief against Warren or Q-CTRL, *id.* ¶ 72, nor did it send either Warren or Q-CTRL any email expressing any concern about Warren's prospective employment, *id.* ¶ 73.

On or around February 1, 2023, Warren was hired by Q-CTRL.  *See* Dkt. 77 ¶¶ 74–75.

On February 2, 2023, Zapata sent Warren a written notice terminating the Consulting Agreement.  *Id.* ¶ 76.  Zapata proceeded to cancel Warren's stock options, and thereafter ceased making his commission payments due to his purported breach of the Consulting Agreement and Separation Agreement.  Dkt. 80 ¶ 76.

Zapata paid Warren payments for Andretti and Phase 1 of DARPA TAI and TAII from October 2022 through January 31, 2023.  Dkt. 77 ¶ 73.  Zapata did not pay Warren any further payments after February 2, 2023.  *Id.* ¶ 77.

On September 5, 2023, Warren received, through his attorney, a right-to-sue letter from the Fair Labor Division of the Office of the Massachusetts Attorney General.  Dkt. 74-33 at 2.

Zapata ceased operations in October 2024.  Dkt. 77 ¶ 2.

**B.    Procedural Background**

Warren initiated this action in December 2023.  As amended, the complaint asserts six claims: against all Defendants, violations of the Wage Act, Mass. Gen. Laws ch. 149, §§ 148 and 150 (Count 1), unjust enrichment (Count 3), and quantum meruit (Count 4); and against Zapata only, breach of contract (Count 2) and breach of the implied covenant of good faith and fair dealing

(Count 5). The complaint also seeks a declaration that Zapata's failure to comply with the Massachusetts Noncompetition Agreement Act renders void the restrictive covenants set forth in the Consulting Agreement, and that Warren is thereafter not bound by any restrictive covenant with respect to Zapata (Count 6).

Following Defendants' unsuccessful motion to dismiss Count 1 of the Amended Complaint, Zapata brought a counterclaim against Warren. The Counterclaim asserts claims for breach of contract arising out of Warren's alleged breach of his noncompetition and non-solicitation obligations under the NDNCA (Counterclaims 1 and 2); the conflict-of-interest provisions of the Consulting Agreement (Counterclaim 3); and the Separation Agreement (Counterclaim 7). The Counterclaim also seeks a declaration that commissions are not wages and are not owed (Counterclaim 4); a declaration that any vesting of options ended on February 2, 2023, and all options terminated on that date (Counterclaim 5); and a declaration that unpaid consulting fees are not wages and are not owed (Counterclaim 6).

All parties have now moved for summary judgment. Warren has moved for summary judgment on his Wage Act claim (Count 1), and on Zapata's breach of contract counterclaims against him (Counterclaims 1 through 3 and 7). Collectively, Defendants have moved for summary judgment on all claims against them.[3]

## II.    **Standard of Review**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st

---

[3] The Individual Defendants filed their motion for summary judgment together, Dkt. 66, and Zapata filed a separate motion for summary judgment, Dkt. 68, in which it "join[ed] and incorporate[ed] the factual assertions and arguments made by Mimi Flanagan and Christopher Savoie . . . as to Plaintiff Michael Warren's arguments under the Wage Act, M.G.L. c. 149, § 148, for unjust enrichment, and quantum meruit." Dkt. 68 at 1. Accordingly, the Court will at times refer collectively, for simplicity, to the arguments of "Defendants."

Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant" but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'"  *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quoting *Lahens v. AT&T Mobility P.R., Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)).  The nonmoving party cannot "rest upon mere allegation or denials," but must instead "present affirmative evidence."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986).

The same standard for summary judgment applies when, as here, parties have filed cross-motions for summary judgment.  *Sec. & Exch. Comm'n v. Navellier & Assocs., Inc.*, 108 F.4th 19, 34 (1st Cir. 2024); *see also Meuse v. Nat'l P.I. Servs., LLC*, 2024 WL 4190081, at *4 (D. Mass. Sept. 13, 2024) ("When a court faces cross motions for summary judgment, it applies the above analysis, unaltered, 'to each motion in turn.'" (quoting *Wilkinson v. Chao*, 292 F. Supp. 2d 288, 291 (D.N.H. 2003))).

III.    **Analysis**

A.    **Plaintiff's Claims**

1.    **Wage Act Claim (Count 1)**

All parties have moved for summary judgment on Plaintiff's Wage Act claim. Before considering each motion separately under the appropriate standard of review, the Court will discuss the legal framework governing claims for unpaid commissions under the Wage Act.[4]

a.    **Background Concerning the Wage Act and Commissions**

The Massachusetts Wage Act "requires '[e]very person having employees in his service' to pay 'each such employee the wages earned' within a fixed period after the end of each pay period." *Lipsitt v. Plaud*, 466 Mass. 240, 244 (2013) (alteration in original) (quoting Mass. Gen. Laws ch. 149, § 148). "To state a claim under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, a plaintiff must allege that (1) he was an employee under the statute, (2) his form of compensation constitutes a wage under the statute, and (3) the defendants violated the Act by not paying his wages in a timely manner." *Klauber v. VMware, Inc.*, 599 F. Supp. 3d 34, 46 (D. Mass. 2022), *aff'd*, 80 F.4th 1 (1st Cir. 2023).

The Wage Act applies to "post-termination renumeration, such as commissions, in certain circumstances." *Dodge v. Mevion Med. Sys., Inc.*, 575 F. Supp. 3d 236, 241 (D. Mass. 2021). That is, "[w]here an employee has already done the work to earn a commission prior to their resignation [or termination], . . . the Wage Act requires the payment of that commission, even if calculating the exact amount would take some time." *See Rivard v. NICE Sys., Inc.*, 2023 WL 5959305, at *6 (D. Mass. Sept. 13, 2023). "While the statute does not itself define 'earn,' the Supreme Judicial

---

[4] The Court will address the motions of the Individual Defendants and Zapata together, as Zapata "join[ed] and incorporat[ed] the Individual Defendants' arguments regarding Plaintiff's claims under the Wage Act." Dkt. 69 at 3.

Court of Massachusetts . . . has adopted the 'plain and ordinary meaning' of the term." *Austin v. Ken's Foods, Inc.*, 2025 WL 889438, at *5 (D. Mass. Mar. 21, 2025) (quoting *Awuah v. Coverall N. Am., Inc.*, 460 Mass. 484, 492 (2011)). Accordingly, "[w]here an employee has completed the labor, service, or performance required of him, . . . according to common parlance and understanding he has 'earned' his wage." *Awuah*, 460 Mass. at 492.

"Commissions qualify as wages under the statute 'when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee.'" *Klauber*, 599 F. Supp. 3d at 46 (quoting Mass. Gen. Laws ch. 149, § 148).[5] "[A] commission is definitely determined or arithmetically determinable—and thus covered by the Wage Act—if it is 'capable of being precisely ascertained.'" *Ellicott v. Am. Cap. Energy, Inc.*, 2016 WL 7799635, at *4 (D. Mass. Apr. 28, 2016) (quoting *Micciche v. N.R.I. Data & Bus. Prods., Inc.*, 2011 WL 4479849, at *7 (D. Mass. Sept. 27, 2011)). "Commissions are 'due and payable' only if any contingencies relating to their entitlement have occurred." *Klauber*, 599 F. Supp. 3d at 46. "When a compensation plan specifically sets out the contingencies an employee must meet to earn a commission, courts apply the terms of the plan." *McAleer v. Prudential Ins. Co. of Am.*, 928 F. Supp. 2d 280, 289 (D. Mass. 2013). "[H]owever, when the plan does not specify, courts generally consider that the employee earns the commission and it becomes due and payable when the employee closes the sale, even if there is a delay in actual payment on the sale." *Id.* (citing cases).

---

[5] While "the failure to pay commissions when they are definitely determined and due and payable is one way to violate the act," the Massachusetts Supreme Judicial Court has "not announce[d] a categorical rule that commissions that do not meet those conditions are considered <u>not</u> to be wages under the act." *Parker v. EnerNOC, Inc.*, 484 Mass. 128, 135 (2020) (emphasis in original).

Finally, the Wage Act "forbids 'special contracts' between an employer and employee that purport to exempt the employer from the requirements of the act." *Parker v. EnerNOC, Inc.*, 484 Mass. 128, 133 (2020).

### b. Defendants' Motion

Defendants contend that Plaintiff's Wage Act claim fails because he was not an "employee" as defined by the Wage Act, and because any payments were not definitely determined, due, or payable as of the time of his separation from employment.[6]

### i. Whether the April 2022 Plan Applies

At the outset, the Court considers Defendants' argument that the April 2022 Plan—which required continued employment to be eligible for commission payments—applies to the deals at issue.

Under Massachusetts law, "'[t]he controlling fact' for the purpose of determining whether a contract exists 'is the intention of the parties.'" *Astellas Inst. for Regenerative Med. v. ImStem Biotechnology, Inc.*, 458 F. Supp. 3d 95, 109 (D. Mass. 2020) (quoting *McCarthy v. Tobin*, 429 Mass. 84, 87 (1999)). "[S]o long as the evidence does not point unerringly in a single direction but is capable of supporting conflicting inferences, the question of whether a contract has been formed between two parties is a question of fact to be determined by the factfinder." *Id.* (alteration in original) (quoting *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 7 (1st Cir. 1994)).

---

[6] Defendants also argued that Plaintiff failed to file his claim with the Attorney General, Dkt. 67 at 13–14, but conceded at oral argument that they have since abandoned that argument.

Here, the parties sharply dispute whether the April 2022 Plan had been finalized, and given that "the evidence does not point unerringly in a single direction," that issue—whether a new contract had been entered into—is a question of fact to be determined by the factfinder.[7]

### ii.    Whether Plaintiff Was an Employee Under the Statute

Defendants argue that Plaintiff cannot state a claim under the Wage Act because he was not an "employee" at the time commission payments were allegedly due, as his employment with Zapata ended on September 30, 2022, and he was not an employee in February 2023 or thereafter when commission payments allegedly would have come due. *See generally* Dkt. 67 at 11–12. That is, according to Defendants, "the Wage Act does not apply to any period of time when Plaintiff was not an employee." *Id.* at 12.

As noted, however, "[w]here an employee has already done the work to earn a commission prior to their resignation [or termination], . . . the Wage Act requires the payment of that commission." *Rivard*, 2023 WL 5959305, at *6.  Viewing the record in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, a factfinder could conclude that Plaintiff had already done the work to earn the commissions at issue while he was still an employee.[8]

### iii.    Whether the Payments Were Definitely Determined, Due, and Payable

Defendants next argue that "[a]t the time [Plaintiff] ceased employment with Zapata, the potential commissions were not due and payable, as the customers had not yet paid," and that "[f]or

---

[7] The Court does not conclude, as Plaintiff has asked it to do, that the March 2022 Plan applies because of allegations in Zapata's counterclaim.

[8] To the extent Defendants argue that the March 2022 Plan "states that commissions were not earned until after 'payment from the client,'" Dkt. 78 at 6, that overstates the language of the contract, which concerns the *timing* of payouts.  That is, the contract specifies when commissions would be paid to Plaintiff—not that the commissions would be "earned" only once the client had paid.

the same reason, they could not be definitely determined." Dkt. 67 at 12.  The Wage Act, however, "is silent as to when a commission must satisfy the stated requirements."  *Parker*, 484 Mass. at 134 n.10.  And in *Parker*, the Supreme Judicial Court expressly stated that it did "not agree with th[e] interpretation" that the plaintiff's commissions must have been "due and payable" and "definitely determined" as of her last day of employment.  *Id.*; *see also id.* at 134 ("[A]lthough the plaintiff's commission never became due and payable pursuant to the true-up policy during her employment, it is, nevertheless, a 'lost wage' under the act subject to trebling."); *Dodge*, 575 F. Supp. 3d at 240 (relying on *Parker* to reject the argument of the defendant "that because the commission that [the plaintiff] seeks was not definitely determined and due and payable at the time of his termination, it is not subject to the statutory protection of the [Wage Act]"); *McAleer*, 928 F. Supp. 2d at 289 (reasoning, on a motion to dismiss, that "any sales McAleer closed while employed at Prudential may have been earned, and could have been due and payable, at the time of the closing, even if Prudential did not receive the premiums until after it terminated McAleer's employment").  Viewing the record in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, a factfinder could conclude that, pursuant to the terms of the March 2022 Plan, the commissions may have been earned, and could have been due and payable, at the time Plaintiff closed the deals, even if Zapata did not receive payment from the clients until after Plaintiff was no longer employed.[9]

---

[9] Nor does the existence of the Separation Agreement alter this conclusion.  Although Defendants assert that the Separation Agreement superseded any prior commission plans, Dkt. 67 at 10, this Court notes, as Zapata itself alleged in its Counterclaim, that "the Separation Agreement anticipated that Warren would continue to receive 'commissions,' payments related to work performed by Warren prior to September 30, 2022, following the end of Warren's employment with Zapata," Dkt. 22 ¶ 23; *see also* Dkt. 18 (observing, in Order denying motion to dismiss, that "[p]aragraph 4 of the Separation Agreement seemingly confirms Warren's continued entitlement to 'commissions already earned,' which 'will continue to be paid in the last payroll of the month following payment from the customer'" (quoting Dkt. 12-4 ¶ 4)).

Accordingly, Defendants' motion for summary judgment as to the Wage Act claim is denied.

### c.    Plaintiff's Motion

Plaintiff has cross-moved for summary judgment on his Wage Act claim, asserting that there is no genuine issue of material fact as to his entitlement to outstanding commission payments. Dkt. 73 at 1.[10]

As the First Circuit has cautioned, however, "a commission plan may incorporate other contingencies that must be met before a commission is due and payable — and if those contingencies are not met, the commissions do not become wages protected by the Wage Act." *Klauber v. VMware, Inc.*, 80 F.4th 1, 13 (1st Cir. 2023); *see also id.* ("Commissions are not necessarily due and payable simply because 'an employee has completed work on the deal.'"). "Continued employment has been identified as a permissible contingency that must be satisfied for a commission to be deemed due and payable." *Fine v. Guardian Life Ins. Co. of Am.*, 589 F. Supp. 3d 139, 152 (D. Mass. 2022).

Here, as noted, there is a disputed question of fact as to whether the parties "intended to be bound to a contract under the terms set forth in their [April 2022] e-mail correspondence," *see Astellas*, 458 F. Supp. 3d at 109, which set forth continued employment as a required contingency. Viewing the record in the light most favorable to Defendants and drawing all reasonable inferences

---

[10] To the extent Plaintiff now contends that he is also entitled to summary judgment on his Wage Act claim based on Zapata's prior *late* payment, *see generally* Dkt. 74 at 15–17, rather than due to *non*-payment, Plaintiff has previously argued—and the Court accepted when ruling on the motion to dismiss—that his "Wage Act claim did not yet exist at the time he entered into the Separation Agreement," and that "[i]t did not come into existence until several months later, when Defendants unilaterally decided to stop making commission payments to Warren." Dkt. 16 at 5; Dkt. 18 (denying motion to dismiss and observing that "the Wage Act violation alleged in Count I did not arise until . . . February of 2023, when defendants allegedly stopped paying him the commissions which he had already earned"). Accordingly, Plaintiff is judicially estopped from arguing a Wage Act violation due to a late payment.

in their favor, a factfinder could conclude that Plaintiff had assented to be bound by the April 2022 Plan, and that the commissions were not, therefore, "due and payable."[11]

Accordingly, Plaintiff's motion for summary judgment on his Wage Act claim is denied.

### 2.    Breach of Contract Claim (Count 2)

Zapata has also moved for summary judgment on Count 2 of the Amended Complaint, asserting that Plaintiff cannot make out a claim for "stock options," "consulting fees," or "commissions." Dkt. 69 at 4. Each will be addressed in turn.

### a.    Options

Count 2 alleges, in part, that "Zapata breached its contractual duties under the Separation Agreement by designating Warren's stock options as forfeited when it unlawfully terminated the Consulting Agreement and, by extension, the Separation Agreement." Dkt. 12 ("Am. Compl.") ¶ 68. Zapata has asserted that "Plaintiff's contract claim for stock options should be dismissed because any such equity has no value." Dkt. 69 at 4. That is, according to Zapata, Plaintiff has acknowledged that any options he had, or may have had, in Zapata are now worthless, and because Plaintiff did not incur any damages with respect to his stock options, any such claim fails. *Id.*

Yet Zapata itself concedes—and the Court takes judicial notice of the fact—that Zapata's stock is worth a non-zero amount. *See* Dkt. 86 at 8 ("The Court may take judicial notice of Zapata's stock price . . . as of the date of this Reply, it is currently trading for less than a penny

---

[11] To the extent Plaintiff argues that the April 2022 Plan cannot apply to the three deals at issue because it would be a "special contract" prohibited by the Wage Act, s*ee* Mass. Gen. Laws ch. 149, § 148 (providing that "[n]o person shall by a special contract with an employee or by any other means exempt himself from" the Wage Act), "Massachusetts courts have been consentient in holding that the special contract provision only bars agreements to exempt *wages* from the prophylaxis of the Wage Act," *Klauber*, 80 F.4th at 13 (emphasis added). As noted, "a commission plan may incorporate other contingencies that must be met before a commission is due and payable"—such as continued employment—"and if those contingencies are not met, the commissions do not become wages protected by the Wage Act." *See Klauber*, 80 F.4th at 13. That is, "if compensation does not qualify as wages under the Wage Act, the special contract provision does not apply at all." *Id.* at 14.

($0.0024).").[12]  Accordingly, Zapata is not entitled to summary judgment on Count 2 with respect to the options.

### b.    Consulting Fees

Count 2 of the Amended Complaint alleges, in part, that "Zapata breached its contractual duties under the Consulting Agreement by failing to pay Warren his consulting fees between February 2023 and the remainder of the consultation period as defined therein."  Am. Compl. ¶ 69. Zapata contends that there was no breach of any agreement for consulting fees, and Plaintiff did not suffer any damages related to same.  Dkt. 69 at 4.  Zapata further asserts that because Plaintiff began working for Q-CTRL on February 2, 2023, making more than the $2,000 per month consulting fee, he fully mitigated his damages and therefore cannot state a claim for unpaid consulting fees.  *Id.*

As noted, the Consulting Agreement provides that it "may be terminated . . . by either party upon written notice to the other party."  Dkt. 77 ¶ 68.  It is undisputed that Zapata provided written notice to Plaintiff on February 2, 2023, that it was terminating the Consulting Agreement.  *Id.* ¶ 76. Because the Consulting Agreement was terminated in accordance with its terms, Plaintiff was not entitled to any consulting fees after February 2, 2023.[13]

Accordingly, Zapata is entitled to summary judgment on Count 2 with respect to any consulting fees that would otherwise have been due to Plaintiff after February 2, 2023.

---

[12] *See Wang Yan v. ReWalk Robotics Ltd.*, 330 F. Supp. 3d 555, 563 n.3 (D. Mass. 2018) (taking judicial notice of publicly traded stock price), *aff'd sub nom. Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22 (1st Cir. 2020).

[13] Plaintiff did not appear to assert, in opposition, that he incurred unpaid consulting fees on February 1 and 2, 2023.

**c.    Commissions**

Count 2 of the Amended Complaint alleges, in part, that "Zapata breached its contractual duties under both the Compensation Plan and the Separation Agreement by failing to pay Warren his commissions." Am. Compl. ¶ 70. Zapata argues that "Plaintiff's breach of contract . . . claims for purported commissions should be dismissed because the April 2022 Compensation Plan applies here, and because Zapata complied with the terms of that plan." Dkt. 86 at 8.

Zapata's "motion for summary judgment on [Plaintiff's] breach of contract claim rests on the same disputed facts" as those at issue in the Wage Act claim. *Ellicott v. Am. Cap. Energy, Inc.*, 2016 WL 7799635, at *6 (D. Mass. Apr. 28, 2016). "In short, the issue of whether [Zapata] violated the terms of [Plaintiff's] compensation plan by failing to pay him his earned commissions is a question of fact properly deferred for trial." *Id.*

Accordingly, Zapata is not entitled to summary judgment on Count 2 with respect to the commissions.

**3.    Unjust Enrichment and Quantum Meruit Claims (Counts 3 and 4)**

All Defendants have moved for summary judgment on Counts 3 and 4 of the Amended Complaint. "Under Massachusetts law, claims for quantum meruit and unjust enrichment are treated similarly and have the same elements." *BRT Mgmt. LLC v. Malden Storage, LLC*, 2021 WL 4133298, at *21 (D. Mass. Sept. 10, 2021). "For a plaintiff to recover on a theory of quantum meruit or unjust enrichment, he must show '(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances [that] would be inequitable without payment for its value.'" *Id.* (alteration in original) (quoting *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009)). "A plaintiff is not entitled to recovery on an unjust-enrichment or quantum-meruit theory where there is a valid

contract that covers the same subject matter and defines the obligations of the parties." *Guldseth v. Fam. Med. Assocs. LLC*, 45 F.4th 526, 541 (1st Cir. 2022) (citing *Bos. Med. Ctr. Corp. v. Sec'y of Exec. Off. of Health & Hum. Servs.*, 463 Mass. 447, 467 (2012)).

Plaintiff acknowledges the rule of *Boston Medical Center*, but argues that "[w]ere the Court to find that some of the services [Plaintiff] provided to Defendants were not provided under a valid contract, yet provided to Defendants nonetheless, and he was deprived of compensation for same, then [his] quantum meruit and unjust enrichment claims need not be dismissed." Dkt. 76 at 13.  In support of that argument, Plaintiff cites to *America's Growth Capital, LLC v. PFIP, LLC*, 73 F. Supp. 3d 127 (D. Mass. 2014), in which the court reasoned that where "a party accepts gratuitous services outside of a contractual relationship, the rule of *Boston Medical Center* does not apply." *Id.* at 153 n.192.  Here, however, although the parties disagree as to which contracts apply, there is no evidence that gratuitous services were provided outside of any contractual relationship.[14]

Accordingly, Defendants are entitled to summary judgment on Counts 3 and 4 of the Amended Complaint.

### 4.    Breach of the Implied Covenant Claim (Count 5)

Zapata has moved for summary judgment on Count 5 of the Amended Complaint, asserting that because it complied with the terms of the relevant agreements, Plaintiff's claim of a breach of the implied covenant claim fails.

"Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract." *Robert Reiser & Co. v. Scriven*, 130 F. Supp. 3d 488, 495 (D. Mass. 2015).  "The covenant provides that 'neither party shall do anything that will have the effect of destroying or

---

[14] At oral argument, Plaintiff conceded that the unjust enrichment and quantum meruit claims were arguments in the alternative.

injuring the rights of the other party to receive the fruits of the contract.'" *Id.* (quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991)). "The implied covenant may not, however, be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship." *Hampshire House Corp. v. Fireman's Fund Ins. Co.*, 557 F. Supp. 3d 284, 299 (D. Mass. 2021).

Here, "[b]ecause the breach of contract claim survives the summary judgment phase, the count alleging a breach of the covenant of fair dealing does as well." *Doe v. Johnson & Wales Univ.*, 425 F. Supp. 3d 108, 114 (D.R.I. 2019). Accordingly, Zapata's motion for summary judgment as to Count 5 is denied.

## 5. Declaratory Relief Claim (Count 6)

Count 6 of the Amended Complaint seeks a judicial declaration "that Zapata's failure to comply with the Massachusetts Noncompetition Agreement Act renders void the restrictive covenants set forth in the Consulting Agreement," and a judicial declaration "that Warren is thereafter not bound by any restrictive covenant with regard to Zapata." Am. Compl. ¶¶ 87–88. Zapata has moved for summary judgment on that Count, asserting that Plaintiff's declaratory judgment case is moot. Dkt. 68 at 2.

"It is ordinarily true that a challenge to a contract becomes moot upon that contract's expiration." *Am. C.L. Union of Massachusetts v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 (1st Cir. 2013); *see also id.* ("Once a contract has expired, and the obligations between its signatories have ended, and if no damages are sought, the parties usually do not have a legally cognizable interest in the case's outcome."). Here, the covenants at issue have expired. Plaintiff has offered no argument as to why Count 6 should not be dismissed as moot, and the Court sees none.

Accordingly, summary judgment is granted as to Count 6.

**B.    Zapata's Counterclaims (Counterclaims 1–3, 7)**

Plaintiff has also moved for summary judgment on Zapata's breach of contract counterclaims against him (Counterclaims 1–3 and 7), on the grounds that those claims are predicated on an unenforceable noncompetition agreement and Zapata has not established any damages that it suffered. Each is addressed in turn below.

**a.    The NDNCA (Counterclaims 1 and 2)**

Plaintiff argues, at the outset, that only the "non-conflict" provision of the Consulting Agreement is relevant, as the Consulting Agreement superseded any prior agreements between Zapata and himself relating to non-competition and non-conflict, including the NDNCA. *See generally* Dkt. 74 at 18–19.

While it is true that the Consulting Agreement states that it "constitute[s] the entire agreement between the parties and supersedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement," Dkt. 77 ¶ 69, the Consulting Agreement was an exhibit to the Separation Agreement, which provided that "[y]ou remain bound by, and will continue to abide by, the Employee Confidential Information and Inventions Assignment Agreement executed by you on April 9, 2018," Dkt. 12-4 at 3.

Although Zapata concedes that the parties used the incorrect title to refer to the NDNCA, Dkt. 79 at 10, Zapata asserts that the only document Plaintiff executed on April 9, 2018, is the NDNCA, *id.*, and that Plaintiff testified that the NDNCA was his "confidential information and inventions assignment agreement," *id.* (citing Warren Dep. 62). Accordingly, drawing all inferences in favor of Zapata, the non-moving party, the Court does not conclude, for purposes of summary judgment, that the NDNCA was superseded by the later agreements.

The Court next considers the argument that "Zapata has failed to identify any damage it has sustained as a result of Warren joining Q-CTRL." Dkt. 74 at 21. Although the evidence Zapata

has put forth regarding its alleged damages is admittedly not overwhelming, it is enough to raise a material question of fact that makes summary judgment on that basis inappropriate.

Summary judgment is therefore denied as to Counterclaims 1 and 2.

**b.** **The Consulting and Separation Agreements (Counterclaims 3 and 7)**

Defendants have argued that "[t]he Separation Agreement and the Consulting Agreement are one contract." Dkt. 79 at 9. Accordingly, the Court will analyze Counterclaims 3 and 7 together. *See generally* Dkt. 79 at 11–12 (analyzing Counterclaims 3 and 7 together).

These agreements do not comply with the terms of the Massachusetts Noncompetition Agreement Act ("MNAA"), Mass. Gen. Laws ch. 149, § 24L. That act "governs the enforceability of noncompetition agreements, like [Plaintiff]'s, entered into on or after October 1, 2018." *DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 109 (D. Mass. 2024), *aff'd*, 118 F.4th 416 (1st Cir. 2024). "[T]he MNAA requires noncompetition agreements to 'expressly state that the employee has the right to consult with counsel prior to signing.'" *Cynosure LLC v. Reveal Lasers LLC*, 2022 WL 18033055, at *9 (D. Mass. Nov. 9, 2022) (quoting Mass. Gen. Laws ch. 149, § 24L(b)(i)). Here, the Separation and Consulting Agreements did not do so, and Plaintiff's non-competition obligations are therefore unenforceable.

Accordingly, the motion for summary judgment is granted as to Counterclaims 3 and 7 with respect to Plaintiff's non-competition obligations under those agreements. *See KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2021 WL 2982866, at *32 (D. Mass. July 15, 2021) (granting motion to dismiss breach of contract claim arising out of non-competition agreement

where the agreement did not expressly state that the employee had the right to consult with counsel prior to signing).[15]

**IV.    <u>Conclusion</u>**

For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. 73) is GRANTED IN PART and DENIED IN PART; the Individual Defendants' motion for summary judgment (Dkt. 66) is GRANTED IN PART and DENIED IN PART; and Zapata's motion for summary judgment (Dkt. 68) is GRANTED IN PART and DENIED IN PART.

**So Ordered.**

/s/ Brian E. Murphy<br>Brian E. Murphy

Dated:  June 2, 2025                                   Judge, United States District Court

---

[15] The Court does not grant the motion to the extent those agreements set forth non-solicitation obligations. *See Automile Holdings, LLC v. McGovern*, 483 Mass. 797, 807 n.15 (2020) ("By its terms, the [MNAA] does not apply to nonsolicitation agreements."); *see also NuVasive, Inc. v. Day*, 954 F.3d 439, 444 (1st Cir. 2020) (same).